# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MASIMO CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2024-1086-NAC |
| JOE E. KIANI, | ) ) ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: December 15, 2025
Date Decided: April 21, 2026

John P. DiTomo, Alexandra M. Cumings, Alec F. Hoeschel, Adam C. Perri, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Michael E. Swartz, Peter H. Fountain, Lauren N. Beck, Quinn Emanuel Urquhart & Sullivan, LLP; *Counsel for Plaintiff Masimo Corporation.*

Garrett B. Moritz, Thomas C. Mandracchia, Ross Aronstam & Moritz LLP, Wilmington, Delaware; John C. Hueston, Hueston Hennigan LLP, Newport Beach, California; Marshall A. Camp, Bram M. Alden, Joseph Aronsohn, Hueston Hennigan LLP, Los Angeles, California; Adam Minchew, Hueston Hennigan LLP, New York, New York; *Counsel for Defendant Joe E. Kiani.*

**Cook, V.C.**

A former CEO claims to be entitled to severance payments under his employment agreement, and he sued in California to get them. The company responded with this action, which seeks to invalidate the at-issue employment agreement as resulting from breaches of fiduciary duty.

The CEO moved to dismiss this case, arguing the forum selection clause in his employment agreement mandates that the litigation proceed in California. This decision agrees and grants his motion.

## I. FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents incorporated by reference therein.[1] At this procedural stage, the court accepts those allegations as true.[2]

### A. Kiani, Masimo, and the Employment Agreement

Defendant Joe Kiani founded Plaintiff Masimo Corporation ("Company") in 1989 and served as its Chairman and CEO until September 19, 2024.[3] During his tenure, the Company's board of directors ("Board") consisted "almost exclusively of directors [Kiani] had hand-picked."[4] Throughout that period, Kiani "exercised

---

[1] *See Windsor I, LLC v. CW Capital Asset Mgmt. LLC*, 238 A.3d 863, 873-74 (Del. 2020).

[2] *In re Match Gp., Inc. Derivative Litig.*, 315 A.3d 446, 458 (Del. 2024).

[3] *See* First Amended Verified Complaint ("FAC") ¶¶ 1, 28-29 (Dkt. 28).

[4] FAC ¶¶ 1, 3, 11 ("[The Company's] prior—and with respect to Mr. Reynolds, current—directors repeatedly demonstrated their 'controlled mindset,' . . . [A]s recently as June 2024, Mr. Reynolds expressed the Kiani-controlled directors' view that Mr. Kiani was 'irreplaceable.'").

virtually absolute control over every aspect of [the Company] and oversaw its expansion."[5]

Kiani "used his control . . . to bestow immense benefits on himself."[6] Most importantly, he caused the Board to agree to an employment agreement and series of amendments with terms "designed for the purpose of divesting the Board of its ability to oversee Mr. Kiani, erecting nearly insurmountable barriers to replacing him, and extorting a penalty from any stockholders that dared to do so."[7]

On November 4, 2015, the Company and Kiani entered into the first version of the at-issue employment agreement ("2015 Agreement").[8] Several provisions of the 2015 Agreement are central to the parties' dispute.[9] The 2015 Agreements stated that upon a "Qualifying Termination" Kiani would receive (1) a severance payment equal to two times his base salary plus his average annual bonus; (2) any unvested stock options; and (3) a "Special Payment" of 2,700,000 restricted share units plus $35,000,000.[10] Beginning in 2018, and for each year after, the Special Payment's stock award and cash payment would decline by ten percent ("Burn-Off Provision").[11]

---

[5] *Id.* ¶ 1; *accord id.* ¶¶ 12, 14.

[6] *Id.* ¶¶ 13-17, 61-78 (alleging Kiani exercised his control to have the Company (1) grant him excess compensation; (2) enter into a related party transaction with Willow Laboratories f/k/a Cercacor Laboratories; and (3) acquire non-party Sound United, LLC in a value destroying transaction).

[7] *Id.* ¶¶ 3-11, 43-60.

[8] *Id.* ¶ 43; *see* FAC, Ex. A ("2015 Agreement").

[9] *See* FAC ¶¶ 43-52. In general, the Company alleges the 2015 Agreement made significant changes to Kiani's prior 2012 employment agreement, "virtually all of which were more favorable to [] Kiani and worse for [the Company] and its stockholders." *Id.* ¶ 43.

[10] *Id.* As alleged, the equity component represented five percent of the Company's outstanding shares. *See id.* ¶ 7.

[11] 2015 Agreement § 8.4(iii).

3

The 2015 Agreement defined "Qualifying Termination" as Kiani's termination of his employment for "Good Reason" or the Company's termination of Kiani "other than pursuant to Sections 7.1, 7.2, or 7.3."[12] "Good Reason" for Kiani to end his employment with the Company includes:

> [(A)] any diminution in [Kiani's] responsibilities, duties and authority . . . including (i) [Kiani] ceasing to serve as [] Chief Executive Officer . . . or (ii) [Kiani] ceasing to serve as Chairman of the Board or the designation of any director other than [Kiani] as the lead director of the Board, (B) a reduction in [Kiani's] rate of compensation or a reduction in [Kiani's] fringe benefits . . . (D) the provision of a Notice of Non-Renewal by the Company, or (E) the occurrence of a 'Change in Control[.][13]

Under the 2015 Agreement, a "Change in Control" occurs when (1) any person or group of persons acting in concert within twelve months acquires at least thirty-five percent of the voting power of the Company or forty percent of the Company's assets; or (2) "the individuals who constituted the Board at the beginning of the twelve [] month period immediately preceding such change cease for any reason to constitute two-thirds or more of the directors then in office."[14]

The 2015 Agreement renews indefinitely every year unless the Company or Kiani provides a notice of non-renewal one year in advance.[15] As discussed, the Company providing a notice of non-renewal would give Kiani "Good Reason" to

---

[12] *Id.* §§ 7.4, 8.4.

[13] *Id.* The "Good Cause" definition also provided that "in each case of clauses (A) through (C) above, 'Good Reason' shall not be deemed to exist unless (x) the Company provides the Company a Notice of termination within ninety (90) days following the initial occurrence of such event, (y) the Company fails to cure the event giving rise to Good Reason within thirty (30) days following its receipt of such Notice of Termination . . . and (z) [Kiani's] resignation for Good Reasons is effective within thirty (30) days after the expiration of the Cure Period." *Id.*

[14] *Id.* § 9.

[15] *Id.* § 3.

4

terminate his employment.[16]  Absent his death[17] or disability,[18] the Board could only terminate Kiani for cause via "a resolution, duly adopted by the affirmative vote of not less than three-quarters of the entire membership of the Board."[19]

Most importantly, the 2015 Agreement contains a forum selection clause that selects the Superior Court of California to resolve any dispute "arising out of or related to" the 2015 Agreement ("Forum Selection Clause"). In contrast, the Company's Bylaws route internal affairs claims to Delaware "[u]nless the Company consents in writing to the selection of an alternative forum" ("Bylaws Provision").[20]

The Company and Kiani twice amended the 2015 Agreement.[21]  In 2017, the parties (1) eliminated the Burn-Off Provision; (2) doubled the "Change in Control" look-back period to 24 months; (3) extended the period in which Kiani could end his employment for "Good Reason" from 90 days to two years; and (4) granted Kiani a right to a "Special Payment" anytime "a change in more than one-third of the Board composition" occurred ("First Amendment").[22]  In 2022, the Company and Kiani further amended the 2015 Agreement to provide that the stock portion of the Special

---

[16] *Id.* § 7.4.

[17] *Id.* § 7.1.

[18] *Id.* § 7.2.

[19] *Id.* § 7.3.  The Company alleges that provision violates its Bylaws, which "requires that 'all matters shall be determined by a vote of the directors present' at a meeting." FAC ¶ 52 (quoting Defendant Joe E. Kiani's Opening Brief in Support of Motion to Dismiss Plaintiff's First Amended Verified Complaint ("MTD Opening"), Ex. 2 ("Masimo Bylaws") § 7.6 (Dkt. 53)).

[20] Masimo Bylaws Art. XI.

[21] FAC ¶¶ 53-60.  Neither of the amendments altered the Forum Selection Clause. *See* FAC, Ex. B ("First Amendment"); Ex. C ("Second Amendment").

[22] *Id.* ¶¶ 54-55; *see* First Amendment.

5

Payment "would vest upon [] Kiani's death or disability" ("Second Amendment", collectively with the 2015 Agreement and First Amendment, "Employment Agreement").[23]

## B. Politan's Investment and Kiani's Ouster

Non-party Politan Capital Management LP ("Politan") is an activist hedge fund.[24] On September 2, 2022, after acquiring a position in the Company, Politan's managing partner told Kiani he wanted representation on the Board.[25] Concerned in part that a Special Payment could be triggered, the Board amended the Company's advance notice bylaws.[26] After the Board rejected Politan's request to "disable" the Special Payment trigger, Politan filed a lawsuit broadly challenging the bylaw amendments and the Employment Agreement ("Politan Action").[27] In response, the Board rescinded the bylaw amendments.[28] Kiani also waived several provisions of the Employment Agreement related to Board composition.[29] With those changes

---

[23] FAC ¶¶ 57-60; *see* Second Amendment.

[24] FAC ¶ 79.

[25] *Id.*

[26] *Id.* ¶¶ 80-81.

[27] *Id.* ¶¶ 82-83

[28] *Id.* ¶ 87.

[29] *Id.* ¶¶ 87-91. *See also id.* ¶ 92 ("[T]he fact that the Board relied on Mr. Kiani to unilaterally waive provisions to make the Employment Agreement more palatable demonstrated the extent to which the Board abdicated its fiduciary duties and handed over complete control of the Company to Mr. Kiani[.]"). The Company insists those actions did not address all the Employment Agreement's problems as Kiani's waivers "left completely untouched . . . the Special Payment, the Single Trigger, the Dead Hand Provision, the Chairman Provision, the Automatic Renewal Provision, and the Supermajority Termination Provision." *Id.* ¶ 91.

6

implemented, the Company's stockholders elected Politan's two nominees to the Board at the 2023 annual meeting.[30]

Perhaps anticipating that result, Kiani tendered his resignation as Company CEO two days before the 2023 annual meeting.[31] The Board's compensation committee chairman rejected Kiani's resignation.[32] The Company alleges that rejection constituted a further breach of fiduciary duties and "unreasonably [] elevate[d] Mr. Kiani's personal interest in remaining [the Company's] CEO over [the Company's] stockholders."[33] Namely, the Company points out that "under the terms of the Employment Agreement, a voluntary termination by Mr. Kiani is not deemed Good Reason and does not entitle Mr. Kiani to receive the Special Payment."[34]

Given the Company's classified Board, Politan mounted a second proxy contest in advance of the Company's 2024 annual meeting.[35] In resistance, the Board and Kiami implemented a series of defensive measures.[36] Ultimately, the Company's stockholders elected two additional Politan nominees to the Board. In doing so, they unseated Kiani and rendered "a majority of the Board independent from [him] for the first time in [the Company's] history."[37]

---

[30] *Id.* ¶ 93.

[31] *Id.* ¶ 94.

[32] *Id.* ¶¶ 94-97.

[33] *Id.* ¶ 95

[34] *Id.*; *see* 2015 Agreement § 7.4.

[35] *Id.* ¶¶ 98-105. At the time of the 2023 and 2024 proxy contests the Company had a classified Board. *See id.* ¶¶ 93, 98.

[36] *See id.*

[37] *Id.* ¶ 106.

7

## C. The California Action

On the day of the 2024 annual meeting, Kiani resigned as CEO, purportedly for "Good Reason under the Employment Agreement because [] the decision by [the Company's] stockholders to vote him off the Board purportedly triggered the Chairman Provision."[38] As a result, Kiani insists he is entitled to severance and the Special Payment.[39] In accordance with the Forum Selection Clause, Kiani promptly sued the Company in California Superior Court ("California Action") seeking declarations that: (1) he properly resigned for Good Reason; (2) the Company could not cure; and (3) he is entitled to severance and the Special Payment.[40] Discovery is ongoing in the California Action.[41]

On October 24, 2024, the Board voted to deem Kiani terminated for cause.[42] The same day, the Company filed this action.[43] The operative complaint advances four causes of action.[44] Count I seeks a declaration that various provisions of the Employment Agreement are unenforceable.[45] Count II seeks a declaration that the

---

[38] *Id.* ¶107.

[39] *Id.* ¶¶ 108-09.

[40] *Id.* ¶ 110 (internal quotation marks omitted). Although Kiani filed the California Action on September 25, 2024, he did not serve the Company until November 12, 2024. *Id.* ¶¶ 113, 115. The Company alleges that delay indicates Kiani filed the California Action as a placeholder to avoid being forced to litigate in Delaware. *Id.* ¶¶ 111-12.

[41] *See* Transcript of 10-30-2025 Oral Argument on Defendant's Motion to Dismiss and Motion to Disqualify Counsel ("OA Tr.") 4:21-6:7 (Dkt. 85) (noting the California Superior Court has already: (1) denied the Company's motion to stay in favor of this litigation; and (2) granted Kiani's motion to compel responses to discovery requests in the California Action).

[42] *Id.* ¶ 113. The next day Kiani filed a notice of dispute challenging whether the Board validly terminated his employment for cause under the Employment Agreement. *Id.*

[43] *See generally* Verified Complaint for Declaratory Judgment (Dkt. 1).

[44] *See* FAC ¶¶ 116-35.

[45] *See id.* ¶¶ 116-21.

8

Special Payment provision is invalid.[46]  Count III seeks a declaration that the Special

Payment amounts to waste.[47]  Count IV alleges "approving and maintaining" the

Employment Agreement constituted breaches of fiduciary duties.[48]  Kiani moved to

dismiss, relying on the forum selection provision as his primary argument.[49]

In the spring of 2025, Kiani moved to disqualify the Company's counsel.[50]  The

motion to disqualify is based on the prior representation of Kiani in the Politan Action

by the law firm now acting as the Company's forwarding counsel here.[51]  Kiani argues

the Politan Action and this case are substantially related, such that Delaware Rule

of Professional Conduct 1.9[52] supports disqualifying the Company's counsel.[53]  Of

---

[46] *See id.* ¶¶ 122-26.

[47] *See id.* ¶¶ 127-29.

[48] *Id.* ¶¶ 130-35.

[49] *See* MTD Opening

[50] Defendant Joe E. Kiani's Motion to Disqualify Counsel ("MTDQ") (Dkt. 57).

[51] *See* MTDQ ¶¶ 1-9.  *See also Dunlap v. State Farm Fire & Cas. Co.*, 950 A.2d 658, at *1 (Del. 2008) (TABLE) (holding a party seeking disqualification must show by "clear and convincing evidence . . . a violation of the Delaware Rules of Professional Conduct so extreme that it calls into question the fairness or the efficiency of the administration of justice.").  There is no dispute that, like here, the Politan Action "challeng[ed] certain provisions of [the] Employment Agreement.  Plaintiff Masimo Corporation's Opposition to Defendant Joe E. Kiani's Motion to Disqualify Counsel ("MTDQ Opp'n") ¶ 2 (Dkt. 68); *see* MTDQ ¶ 4 (stating the Politan Action sought "to invalidate certain provisions of Kiani's Employment Agreement.").

[52] Del. R. Prof. Cond. 1.9 ("A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interest of the former client unless the former client gives informed consent, confirmed in writing."); *see id.*, cmt. 1 ("Nor could a lawyer who has represented multiple clients in a matter represent one of the clients against the others in the same or a substantially related matter after a dispute arose among the clients in that matter, unless all affected clients give informed consent.").

[53] MTDQ ¶¶ 15-25.  Kiani contends that the Company's counsel "performed substantial work" on his behalf in the Politan Action, including (1) responding to discovery requests; (2) participating in meet and confers; (3) defending him at his deposition; and (4) briefing and arguing a motion to dismiss. MTDQ ¶¶ 6-8 (citing Affidavit of Defendant Joe E. Kiani in Support of the Motion to Disqualify Counsel ¶¶ 8-9 (Dkt. 57); MTDQ, Exs. A-B, D).

course, the Company's counsel opposes disqualification.[54] The parties agree, however, that the Court need not address the motion to disqualify if it grants the motion to dismiss.[55]

## II.    STANDARD OF DECISION

A motion to dismiss based on a forum selection clause implicates Court of Chancery Rule 12(b)(3).[56] On a Rule 12(b)(3) motion, "[u]nlike a motion to dismiss for failure to state a claim, 'the court is not shackled to the plaintiff's complaint and is permitted to consider extrinsic evidence from the outset.'"[57] When considering a forum selection clause, "the well-settled rule is that the court should give effect to the terms of private agreements to resolve disputes in [the chosen] forum out of respect for the parties' contractual designation."[58] Accordingly, courts "defer to forum selection clauses and grant Rule 12(b)(3) motions to dismiss where the parties use express language clearly indicating that the forum selection clause excludes all other courts before which those parties could otherwise properly bring an action."[59]

---

[54] The Company argues (1) its counsel "never received personal confidential information from Kiani that was not also shared with Masimo"; (2) the "two representations are not substantially related"; and (3) the firm "implemented a prophylactic ethical wall" that purportedly abates any conflict. MTDQ Opp'n ¶¶ 1, 17-32.

[55] *Id.* 77:7-21.

[56] *Mack v. Rev Worldwide, Inc.*, 2020 WL 7774604, at *6 (Del. Ch. Dec. 30, 2020) ("The proper procedural rubric for addressing a motion to dismiss based on a forum selection clause is found under Rule 12(b)(3), improper venue." (citation modified)); *see* Ct. Ch. R. 12(b)(3).

[57] *Centene Corp. v. Accellion, Inc.*, 2022 WL 898206, at *5 (Del. Ch. Mar. 28, 2022).

[58] *Troy Corp. v. Schoon*, 2007 WL 949441, at *2 (Del. Ch. Mar. 26, 2007) (citation modified); *see Thompson St. Cap. Partners IV, L.P. v. Sonova U. S. Hearing Instruments, LLC*, 340 A.3d 1151, 1165-66 (Del. 2025) ("Delaware is a contractarian state that holds parties' freedom of contract in high regard." (citation modified)).

[59] *Scanbuy, Inc. v. NeoMedia Techs., Inc.*, 2014 WL 5500245, at *2 (Del. Ch. Oct. 31, 2014) (citation modified).

## III. ANALYSIS

Kiani advances five main arguments in support of the Motion to Dismiss.[60] Because the Court agrees with his Forum Selection Clause argument, it need not address the full scope of the parties' dispute.

Kiani argues that the Forum Selection clause compels dismissal.[61] The Forum Selection Clause states:

> [a]ny suit, action or proceeding arising out of or relating to this Agreement shall be brought in the Superior Court of California for the County of Orange, and the parties hereby irrevocably accept the exclusive personal jurisdiction of such court for the purpose of any suit, action, or proceeding.[62]

Kiani insists that the Company's claims fall within that provision.[63] The Company raises several arguments in response.[64] None carry the day.

---

[60] *See* MTD Opening at 25-56 (arguing (1) the Forum Selection Clause makes Delaware an improper venue; (2) *forum non conveniens* compels dismissal in favor of the California Action; (3) the operative complaint omits indispensable parties; (4) the Company's allegations fail to state a claim; and (5) the Company's claims are time-barred.).

[61] MTD Opening at 25-42; Defendant Joe E. Kiani's Reply Brief in Further Support of Motion to Dismiss Plaintiff's First Amended Verified Complaint at 3-16 (Dkt. 67).

[62] 2015 Employment Agreement § 18.

[63] MTD Opening at 25-36 ("breach of fiduciary duty claim plainly arises out of or relates to the Employment Agreement.").

[64] *See* Plaintiff's Answering Brief in Opposition to Motion to Dismiss the First Amended Verified Complaint ("MTD Opp'n") at 18-31 (Dkt. 55); Plaintiff's Supplemental Brief in Opposition to Defendant's Motion to Dismiss the First Amended Verified Complaint ("Pl. Supp. Br.") ¶¶ 1-22 (Dkt. 91); Plaintiff's Supplemental Response in Opposition to Defendant's Motion to Dismiss the First Amended Verified Complaint ("Pl. Supp. Opp'n") ¶¶ 1-20 (Dkt. 96).

## A. The Bylaws Provision Argument

The Company first asserts that the Bylaws Provision controls over the Forum Selection Clause.[65] The Bylaws Provision states in part:

> Unless the [Company] consents in writing to the selection of an alternative forum, the sole and exclusive forum for . . . (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee or stockholder of [the Company] to [the Company] or [its] stockholders, . . . or (iv) any action asserting a claim governed by the internal affairs doctrine shall be a state or federal court located within the State of Delaware[.][66]

The Company's fiduciary duty claims implicate the internal affairs doctrine.[67] Thus, the Company contends that the Bylaws Provision requires that its claims proceed in Delaware, notwithstanding the Forum Selection Provision.

That argument fails because the Bylaws Provision explicitly allows the Company to consent to an alternative forum.[68] That is exactly what occurred here: the Company and Kiani contracted to litigate claims "arising out of or relating to" the Employment Agreement in California.[69] The Company responds by arguing that it did not consent to an alternative forum for fiduciary duty claims; "[r]ather, [it]

---

[65] *See* MTD Opp'n at 18-20, 26-31 ("[The] Bylaws provide [] that Delaware is the exclusive forum for claims arising out of breaches of fiduciary duties and unquestionably govern [the Company's] claims in this action.").

[66] Masimo Bylaws Art. XI. Notably, the Company repeatedly omitted the proviso in the first sentence of the Bylaws Provision from its arguments on the motion to dismiss. *See* MTD Opp'n at 18-19; OA Tr. 33:22-35:19.

[67] *See Rosenblatt v. Getty Oil Co.*, 1983 WL 8936, at *13 (Del. Ch. Sept. 18, 1983) (holding claims regarding "alleged waste" implicate "the area of internal corporate business dealings."); *Hamilton P'rs, L.P. v. Highland Cap. Mgmt., L.P.*, 2014 WL 1813340, at *9 (Del. Ch. May 7, 2014) (noting "claims implicating a corporation's internal affairs [include] claims for breach of fiduciary duty[.]").

[68] Masimo Bylaws Art. XI ("Unless the [Company] consents in writing to the selection of an alternative forum[.]").

[69] *See* 2015 Agreement § 18.

consented only to a California forum for claims arising out of or related to th[e] specific Employment Agreement." [70] But, as further discussed herein, all the Company's claims are related to the Employment Agreement under both California and Delaware law. The Company also contends that "Kiani has already acknowledged that Delaware is the proper forum . . . by litigating the validity of the Employment Agreement in" the Politan Action. [71] That the Politan Action was litigated in this Court is of no moment. Politan was not a party to the Employment Agreement, and § 122(18) had not yet been enacted. Accordingly, the Bylaws Provision does not supersede the Forum Selection Clause.

## B. The Independent-Source Principle Argument

The Company next argues that as a matter of Delaware law, a contractual forum selection clause cannot encompass corporate fiduciary duty claims where the at issue fiduciary duties arise independently of the contract. [72] Under the Company's reading of precedent, Delaware courts have preserved Delaware as a forum for fiduciary duty claims to ensure the state can provide oversight for those who control its corporations. [73] Although that may have been Delaware law once, it no longer is,

---

[70] MTD Opp'n at 28-29.

[71] *Id.* at 30-31.

[72] *Id.* at 21-26 ("[A] forum selection provision[] in [a] commercial agreement[] do[es] not include within [its] terms breaches of fiduciary duties and other matters that implicate the internal affairs of Delaware corporations.").

[73] *See id.*; *see Ryan v. Gifford*, 918 A.2d 341, 349 (Del. Ch. 2007) ("Delaware courts have a significant and substantial interest in overseeing the conduct of those owing fiduciary duties to shareholders of Delaware Corporations.").

at least for governance agreements under recently enacted § 122(18) of the Delaware General Corporation Law ("DGCL").[74]

The line of decisions on which the Company relies to advance that argument begins with the Delaware Supreme Court's decision in *Parfi Holding AB v. Mirror Image Internet, Inc.*[75] In *Parfi*, the Supreme Court considered whether an arbitration clause in an "Underwriting Agreement" that applied to any claims "arising out of or in connection with" the agreement covered a minority stockholder's breach of fiduciary duty claims.[76] Notably, the party seeking to avoid the forum selection clause in *Parfi* was not a party to the "Underwriting Agreement," but was allegedly bound thereby because it stood in the signatory corporation's shoes.[77] Conversely here, the Company signed and repeatedly reaffirmed the Employment Agreement containing the Forum Selection Clause.[78]

Ultimately, the *Parfi* court held that fiduciary duty claims were "beyond th[e] scope" of the forum selection clause because they did not "depend on the existence of

---

[74] Some caselaw suggests the carve-out in the Company's bylaws coupled with the Forum Selection Clause are sufficient to route the Company's claims to California even absent DGCL § 122(18). *See McDonald's Corp. v. Easterbrook*, 2021 WL 351967, at *3 n.33 (Del. Ch. Feb. 2, 2021) ("The forum selection bylaw, at Section 13 of the McDonald's Amended and Restated Bylaws, dictates forum selection in certain instances '[u]nless the Corporation consents in writing to the selection of an alternative forum.' Thus, if the Forum Selection Clause were to apply to McDonald's claims as alleged here (it does not), then the plain language of the forum selection bylaw would hold McDonald's to that promise.").

[75] 817 A.2d 149, (Del. 2002).

[76] *See id.* at 151-52, 154-55.

[77] *See id*; *see Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 129 (Del. 2021) ("[F]or a derivative action, the equity owner acts in a representative capacity on behalf of an entity. In that representative capacity, the plaintiff steps into the shoes of the entity and asserts the injury on its behalf.").

[78] *See* 2015 Employment Agreement; First Amendment; Second Amendment.

14

the Underwriting Agreement."[79]  The Supreme Court observed corporate "fiduciary duties . . . are beyond the contract and rest on an independent set of rights provided for in the Delaware corporate law," such that the fiduciary duty claims "would be independently and separately assertable" absent the contract at issue.[80]  The *Parfi* court concluded that "[a]bsent a clear expression of an intent to arbitrate breach of fiduciary duty claims, [a stockholder] has the right to have the merits of those claims adjudicated by the Court of Chancery."[81]  Thus, *Parfi* seemingly stands for the proposition that when fiduciary duty claims are status-based and arise independent of a contract, a contractual forum selection clause cannot route them outside Delaware ("Independent-Source Principle").

The *Parfi* decision reflected the tenor of the times.  In response to *Elf Atochem*,[82] the General Assembly amended the Delaware Limited Liability Company Act ("LLC Act") to restrict "a Delaware LLC from designating a foreign jurisdiction as its exclusive jurisdiction for internal disputes."[83]  Soon thereafter, the Delaware Supreme Court issued in quick succession its decisions in *Parfi* and *Gotham Partners*.[84]  Like *Parfi*, *Gotham Partners* suggested the then-current Delaware

---

[79] *Parfi*, 817 A.2d at 151, 155.

[80] *Id.* at 156-58.

[81] *Id.* at 160 (citing *DMS Properties–First v. Scott Associates,* 748 A.2d 389, 391 (Del. 2000)).

[82] *See Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 294-96 (Del. 1999) (rejecting an argument that then-current "Section 18–109(d) prohibits vesting exclusive jurisdiction in a court outside of Delaware[.]").

[83] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 117 n.62 (Del. 2020) (discussing amendment to Section 18-109(d) of the LLC Act).

[84] *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 166-68 (Del. 2002).

15

Limited Partnership Act prohibited the full elimination of fiduciary duties.[85]  During that era, the Delaware Supreme Court and legislature seemed to be sending a message: Delaware courts must remain available to address fiduciary duty claims. Therefore, unless parties specifically contracted for arbitral review of fiduciary conduct, they could not divest the Delaware courts of jurisdiction over those claims.

In the decades following *Parfi*, several of this Court's decisions endorsed and clarified the Independent-Source Principle.  In *Feeley*, this Court considered whether an arbitration provision in a CEO's employment agreement covered claims that the CEO breached his fiduciary duties to the LLC for which he worked.[86]  Applying the Independent-Source Principle, the Court held "[a] court should not compel a party to arbitrate a cause of action independent of the agreement containing the arbitration provision."[87]  Quoting *Parfi*, the *Feeley* Court concluded "[a] cause of action is independent of an agreement if [it] does not 'touch on contract rights or contract performance' under the agreement."[88]  Based on that principle, the Court concluded a contractual arbitration provision generally does not capture fiduciary duty claims where the underlying contract "neither gave rise to nor governed the defendants' status as fiduciaries[.]"[89]

---

[85] *See id.*

[86] *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 655-56 (Del. 2012).

[87] *Id.* at 656.

[88] *Id.* (quoting *Parfi*, 817 A.2d at 155).  Restated, "a cause of action is independent if it could have been brought had the parties not signed the contract containing the arbitration clause." *Id.* (citation modified).

[89] *Id.*  Notably, although the *Feeley* court ruled claims that the CEO breached his fiduciary duties "in his capacity as the managing member" of the LLC were not subject to arbitration, it also held that

16

Likewise in *OTK*, the Court considered whether a forum selection clause in one of several merger documents captured claims "that the sell-side fiduciaries breached their fiduciary duties of care and loyalty by approving the transaction[.]"[90]  The Court observed that "it has not traditionally been thought that a contractual forum selection provision in the transaction agreement governed the stockholder plaintiffs' claims for breach of fiduciary duty and aiding and abetting."[91]  Thus, the Court concluded the contractual forum selection clause did not cover the at-issue fiduciary duty claims which depended on a set of rights independent of the underlying contract.[92]

Most recently, this Court's *Harris* decision provided the clearest articulation of the Independent-Source Principle as applied to breach of corporate fiduciary duty claims.[93]  The *Harris* Court noted that:

> There does not appear to be any case in which a Delaware court has held that a forum selection clause in a management services agreement, consulting agreement, or employment agreement encompassed direct

---

"[t]here is a non-frivolous argument" that a claim that the CEO breached "his duties as President and CEO . . . arises out of his Employment Agreement" such that the arbitrator had to decide substantive arbitrability. *Id.* at 656-57 ("The Employment Agreement gives rise to and governs Feeley's service in his capacities as President and CEO [] [] and a claim for breach of the fiduciary duties owed by Feeley in those capacities is therefore subject to arbitration.").

[90] *OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 721 (Del. Ch. 2014).

[91] *Id.* at 721.  The Court observed that if a contractual forum selection clause captured fiduciary duty claims "then the solution to the problem of multi-forum litigation has been hiding in plain sight for decades, under the noses of the courts and the corporate bar." *Id.*  While the Court recognized "[t]here are obvious advantages to [such an] approach, [] it would represent a substantial shift in the status quo . . . [and] a change of that magnitude would need to come from the Delaware Supreme Court." *Id.* at 721.

[92] *Id.* at 720-21.  The Cout contrasted that situation "with an arbitration provision or other forum selection clause that appears in the document that gives rise to the fiduciary relationship, which will govern fiduciary duty claims." *Id.* at 721 (citing *Elf Atochem*, 727 A.2d at 294-95 (Del. 1999)).  Like *Feeley*, the *OTK* court described *Elf Atochem* as "requiring arbitration of claims for breach of fiduciary duty by [a] manager when [an] LLC agreement giving rise to [the] manager's status and duties contained [a] mandatory arbitration clause." *Id.*; *see Feeley*, 62 A.3d at 656.

[93] *See Harris v. Harris*, 2023 WL 193078, at *24-25 (Del. Ch. Jan. 16, 2023).

17

claims for breach of fiduciary duty . . . . If an ordinary forum selection clause encompassed those claims, then corporate planners could readily divest the Delaware courts of jurisdiction and route internal affairs cases to other states or into arbitration. . . . If corporations wish to route internal affairs claims to a particular forum, then they can adopt charter or bylaw provisions designed to achieve that result. A provision in a contract does not do the trick.[94]

Citing *OTK*, the Cout held a contractual forum selection clause did not cover fiduciary duty claims, "because whether a third party owed fiduciary duties . . . depends upon 'a set of rights and obligations that are independent of any contract,' and therefore did not arise out of or relate to the contract."[95] Thus, the Company's Independent-Source principle argument had a firm grounding in precedent, before the 2024 adoption of DCGL § 122(18).[96]

Section 122(18) expressly authorizes a corporation to enter contracts with current or prospective stockholders and to provide for adjudication in alternative fora.[97] It states:

Every corporation created under this chapter shall have power, whether or not so provided in the certificate of incorporation, to: . . . (18) Notwithstanding § 141(a) of this title, make contracts with 1 or more current or prospective stockholders . . . in its or their capacity as such, in exchange for such minimum consideration as determined by the board of directors . . . provided that no provision of such contract shall be enforceable against the corporation to the extent such provision is contrary to the certificate of incorporation or would be contrary to the

---

[94] *Id.* at *24.

[95] *Id.* (quoting *OTK*, 85 A.3d at 721).

[96] *See Moelis & Co. v. W. Palm Beach Firefighters' Pension Fund*, 2026 WL 184868, at *5 (Del. 2026) ("Senate Bill 313 [which enacted § 122(18)] was passed by the Delaware Senate and House of Representatives in mid-June 2024 and was signed by the Governor on July 17, 2024, with an effective date of August 1, 2024.").

[97] *See* 8 *Del. C.* § 122(18).

laws of this State (other than § 115 of this title) if included in the certificate of incorporation.[98]

That plain text provides that a corporation can contract for governance arrangements with stockholders without offending § 141(a) ("141(a) Exclusion"),[99] so long as those contracts do not otherwise violate the certificate of incorporation or other provisions of the DGCL, except for § 115 ("115 Exclusion").[100]

Adopted in 2015, § 115 seemingly reflects the same policy views articulated in *Parfi* and *Gotham Partners*.[101] Section 115 states, in relevant part:

> The certificate of incorporation or the bylaws may require . . . that any or all internal corporate claims shall be brought solely and exclusively in any or all of the courts in this State, and no provision of the certificate of incorporation or the bylaws may prohibit bringing such claims in the courts of this State. [] "Internal corporate claims" means claims, including claims in the right of the corporation, [] that are based upon a violation of a duty by a current or former director or officer or stockholder in such capacity[.][102]

Under § 115's terms a forum selection clause in a corporation's certificate of incorporation or bylaws cannot "exclud[e] Delaware as a forum for internal corporate

---

[98] *Id.* § 122.

[99] 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of the board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.").

[100] *See, e.g.*, *Evans v. State*, 212 A.3d 308, 314 (Del. Super. 2019) (noting Delaware "[c]ourt[s] appl[y] settled principles of statutory interpretation, giving effect to the plain language of an unambiguous statute, and applying the literal meaning of the statute's words." (citing *Arnold v. State*, 49 A.3d 1180, 1183 (Del. 2012)).

[101] *See In re Carvana Co. S'holder Litig.*, 2022 WL 3923826, at *5 (Del. Ch. Aug.31, 2022) ("Consider the purpose of forum selection provisions in corporate charters and bylaws. Expressly permitted by Section 115 of the Delaware General Corporation Law, those provisions are intended to corral internal affairs cases so they can be heard in the Delaware courts.").

[102] 8 *Del. C.* § 115.

claims."[103]   Thus, § 115 preserves Delaware courts as a mandatory option to adjudicate internal affairs claims.

Section 122(18) takes a different approach.  By including the 115 Exclusion, the legislature authorized stockholder agreements that route internal affairs claims related thereto exclusively to a non-Delaware forum.   The legislative synopsis expressly memorializes that intent by stating, "[t]he proviso excludes § 115, so that corporations may enter into contracts under § 122(18) with exclusive forum and arbitration provisions that do not select the courts of this State to adjudicate claims under the contracts."[104]  The legislature reaffirmed that intent in the synopsis for the 2025 amendment to § 115, writing "[§] 115 [is] not intended to prevent . . . the selection of a forum other than a court in this State, if the provision is included in a stockholder agreement or other writing signed by the stockholder against whom the provision is to be enforced."[105]

The 141(a) Exclusion further evidences that a forum selection clause in a stockholder agreement can cover fiduciary duty claims by overriding *Parfi*'s

---

[103] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 117 (Del. 2020).

[104] Del. S.B. 313, syn., 152d Gen. Assem. (2024).  The use of the phrase "under the contract" in the synopsis could suggest that fiduciary duty claims are not included under this Court's interpretation of the phrase "arising under." *See Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1086-87 (Del. Ch. 2021).  Yet, there are several potential issues with that reading.  For one, the phrase "under the contract" nowhere appears in § 122(18)'s operative text.  While statutory synopses are undoubtably helpful in interpreting a statute and are "a proper source for ascertaining legislative intent," they "cannot change the meaning of an unambiguous statute." *Bd. of Adjustments of Sussex Cnty. v. Verleysen*, 36 A.3d 326, 332 (Del. 2012) (internal quotation marks omitted).  Additionally, such a narrow reading of § 122(18) is inconsistent with Delaware's recent emphasis on freedom of contract principles discussed herein.  Moreover, such a reading would seem to risk rendering the 115 Exclusion superfluous.

[105] Del. S.B. 95, syn., 153d Gen. Assem. (2025).

articulation of the Independent-Source Rule. Significant precedential authority supports the understanding that "the board's authority under Section 141(a) provides the foundation for directors' fiduciary duties."[106] As discussed, *Parfi* held a contractual forum selection clause cannot capture corporate fiduciary duty claims, because they "rest on an independent set of rights provided for in the Delaware corporation law."[107] Thus, *Parfi* seemingly recognized that § 141(a) formed the basis of the Independent-Source Principle. Accordingly, by stating courts must evaluate § 122(18) agreements "[n]otwithstanding § 141(a)," the 141(a) Exclusion overrides the Independent-Source Principle. The 141(a) Exclusion "'clearly signals the drafters' intention that the provisions of [§ 122(18)] override conflicting provisions of [§ 141(a)].'"[108] Therefore, for purposes of stockholder agreements, § 122(18) legislatively overrides *Parfi*, *Feeley, OTK*, and *Harris*'s reliance on the Independent-Source Principle. For purposes of stockholder agreements, those cases are abrogated and no longer good law (although they may remain good law for other types of agreements).

That interpretation of § 122(18) is consistent with Delaware's emphasis on freedom of contract and private ordering.[109] Numerous recent Delaware Supreme

---

[106] *E.g.*, *McRitchie v. Zuckerberg*, 315 A.3d 518, 536 & n.23, 576 (Del. Ch. 2024) (collecting cases); *Quickturn Design Systems, Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998) ("In discharging the statutory mandate of Section 141(a), the directors have a fiduciary duty to the corporation and its shareholders.").

[107] *Parfi*, 817 A.2d at 158.

[108] *Cornette*, 2026 WL 309253, at *6 (Del. Feb. 5, 2026) (quoting *Cisneros v. Alpine Ridge Gp.*, 508 U.S. 10, 18 (1993)).

[109] Prior to § 122(18)'s enactment, the Court questioned "whether it would contravene public policy to interpret [a] forum selection provision [in an employment agreement] to apply to common law claims for breach of fiduciary duty, or whether an officer of a Delaware corporation can effectively 'opt out' of the practical consequences of 10 Del. C. § 3114 through an employment agreement with a Delaware corporation." *EnVen Energy Corp. v. Dunwoody*, 2020 WL 2770609 at *4 n.40 (Del. Ch. May 28, 2020).

21

Court decisions have relied on the principle that "[t]he courts of this state hold freedom of contract in high–some might say, reverential–regard."[110] Consistent with that principle, Delaware courts have repeatedly found freedom of contract outweighs countervailing public policy concerns.[111] By elevating freedom of contract, "Delaware law seeks to further private ordering and enable parties to define for themselves the parameters of their rights and obligations."[112] Doing so "promote[s] clarity in the law in order to facilitate commerce,"[113] which "has wealth-creating and peace-inducing effects."[114] Indeed, this Court has recently observed that "freedom of contract is the

---

The Court in *EnVen* expressed skepticism that the "*Bonanno v. VTB Holdings, Inc.* [decision] resolved the precise policy question at issue in favor of private ordering." *Id.* (citing 2016 WL 614412, at \*15 (Del. Ch. Feb. 8, 2016)). The Court differentiated *Bonanno*, which, like here, "involved a forum selection clause in an agreement signed by the stockholder against whom the agreement was being enforced." *Id.* (citing *Bonanno*, 2016 WL 614412, at \*15).

[110] *Cantor Fitzgerald*, 312 A.3d at 676; *see Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 487 (Del. 2024) ("Delaware is a contractarian state that holds parties' freedom of contract in high regard."); *Thompson Street Cap. Prs IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 340 A.3d 1151, 1165-66 (Del. 2025) (same); *Village Practice Mgmt. Co., LLC v. West*, 342 A.3d 295, 313-14 (Del. 2025) (same); *Origis USA LLC v. Great Am. Ins. Co.*, 345 A.3d 936, 952 (Del. 2025) (same).

[111] *See Movora LLV v. Gendreau*, 345 A.3d 997, 1025 (Del. Super. 2025) (freedom of contract outweighed a public policy against contracts that indemnify a party from its own willful acts); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 857 (Del. Ch. 2022) ("Delaware law generally seeks to give primacy to the law of contract by elevating contractual agreements over general tort law principles."); *Cantor Fitzgerald*, 312 A.3d at 688-89 (freedom of contract trumped concerns raised by "covenants not to compete subject to Delaware law[.]"); *LKQ Corp. v. Rutledge*, 337 A.3d 1215, 1220-23 (Del. 2024) (freedom of contract outweighed concerns that the at-issue agreement "require[d] the return of benefits already received[.]"). *See also RSUI Indemnity Co. v. Murdock*, 248 A.3d 887, 903 (Del. 2021) ("[W]hen parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be lightly found[.]" (internal quotation marks omitted)).

[112] *Harron*, 275 A.3d at 857; *see Abry P'rs, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1061 (Del. Ch. 2006) ("We [] respect the ability of sophisticated businesses . . . to make their own judgments about the risk they should bear and the due diligence they undertake, recognizing that such parties are able to price factors such as limits on liability.").

[113] *ev3, Inc. v. Lesh*, 114 A.3d 527, 529, n.3 (Del. 2014) (collecting cases).

[114] *LKQ*, 337 A.3d at 1221 (internal quotation marks omitted).

22

rule and restraints on this freedom the exception[.][115] Thus, the Independent-Source Principle's *per se* prohibition on a contractual forum selection clause that captures corporate fiduciary duty claims contravenes freedom of contract principles. Thus, by enacting § 122(18) the legislature endorsed, at least implicitly, the modern judicial trend – "Delaware enables sophisticated counterparties to contract as they wish and her courts are loath to disturb bilaterally-negotiated terms."[116]

As interpreted herein, § 122(18) has two major implications for this case. First, the 115 Exclusion establishes that the Forum Selection Clause can vest jurisdiction over internal affairs claims exclusively in California. Second, by overriding the *Parfi*-based Independent-Source Principle, the 141 Exclusion shows the Forum Selection Clause *can* capture the Company's fiduciary duty claims. Thus, § 122(18) requires rejecting the Company's argument that the Forum Selection Clause cannot route its claims to California as a matter of law.

## C. The Employment Agreement is a Stockholder Agreement within the Meaning of § 122(18)

Perhaps recognizing § 122(18)'s effect, the company argues "Section 122(18) does not apply" to the Employment Agreement "because Kiani contracted as an employee, not as a stockholder."[117] The Company contends that the Employment Agreement "implicates fundamentally different rights than a stockholder

---

[115] *New Enters. Assoc. 14, L.P. v. Rich*, 295 A.3d 520, 566 (Del. Ch. 2023) (internal quotation marks omitted).

[116] *Unbound P'rs Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1031-32 (Del. Super 2021) (collecting cases).

[117] Pl. Supp. Opp'n ¶¶ 4-5, 11-12, 19-22; Pl. Supp. Br. ¶¶ 1-2, 5-18.

23

agreement."[118] Yet, the Employment Agreement's terms and the Company's repeated characterization thereof undermine that argument.

Section 122(18) applies to contracts between a corporation and "1 or more current or prospective stockholders (or one or more beneficial owners of stock) in its or their capacity as such[.]"[119] There is no dispute that the Employment Agreement is a contract between the Company and Kiani, who was and remains a stockholder.[120] Therefore, the question becomes whether Kiani entered into the Employment Agreement, wholly or in part, in his capacity as a current or prospective stockholder.

Section 122(18) does not define what it means for stockholders to contract "in . . . their capacity as such[.]" The Employment Agreement's title is not dispositive and does not preclude finding § 122(18) applies. The title is merely a contract heading, and "[c]ontract headings do not constitute controlling evidence of a contract's substantive meaning[.]"[121] Rather, the Court must analyze the Employment Agreement's substance to determine whether it is a contract between the Company and Kiani in his capacity as a stockholder.

The Court need not decide the full scope of what it means for stockholders to contract with a corporation "in . . . their capacity as such." Here, the Employment

---

[118] Pl. Supp. Opp'n ¶¶ 7-18 (citing *Weaver v. ZeniMax Media, Inc.*, 2004 WL 243163, at *3 (Del. Ch. Jan. 30, 2004) ("[w]hen a corporate officer signs an employment contract committing to fill an office, he is acting in a personal capacity in an adversarial, arms-length transaction."); *Riblet Prods. Corp. v. Nagy*, 683 A.2d 37, 40 (Del. 1996) (holding "contractual rights as an employee . . . are separate from [an individual's] rights as a stockholder.")).

[119] 8 *Del. C.* § 122(18).

[120] *See* 2015 Agreement.

[121] *E.g.*, *Fulkerson v. MHC Operating Ltd.*, 2002 WL 32067510, at *5 (Del. Super. Sept. 24, 2002) (citing *Cantor Fitzgerald*, 724 A.2d at 582 n.35).

Agreement's terms, which are discussed further below, show Kiani entered into the Employment Agreement at least in part in his capacity as the Company's controller.[122] The Employment Agreement gave Kiani extraordinary influence over stockholder-level decisions as to Board composition.[123] Indeed, the crux of Masimo's claims is that "provisions in the Employment Agreement [] have nothing to do with retaining CEO talent and everything to do with placing unreasonable restrictions on the stockholders' right to elect directors of their choosing."[124]

---

[122] The Company repeatedly characterizes Kiani as having controlled the Company. FAC at 35 (Masimo's Controlled Board Again Schemes *to Preserve Mr. Kiani's Control*[.]" (emphasis added)); ¶ 1 ("Kiani exercised virtually absolute control over every aspect of Masimo[.]"), ¶ 105 ("Mr. Kiani once again used the Company's resources in an attempt to fend off a challenge to *his continued control of Masimo*." (emphasis added)); Masimo Corporation's Motion to Disqualify Counsel ("Masimo MTDQ") ¶¶ 12 (Dkt. 24) ("Masimo intends to prove that the Special Payment—along with the other Invalid Provisions—was designed with the purpose of entrenching *Mr. Kiani in control of Masimo* indefinitely." (emphasis added)), 24 ("Mr. Kiani and Masimo, then under Mr. Kiani's dominion and control[.]"). Recognizing that characterization, Kiani's counsel argued "the gravamen of Masimo's claims here are that this is an agreement between the company *and the controlling stockholder* basically in his capacity as such." OA Tr. 73:17-24 (emphasis added). The Court accepts the parties' characterization for purposes of analyzing and resolving the Motion. *See, e.g.*, *Weiss v. Weiss*, 952 A.2d 149, 151 (Del. Ch. 2007). Indeed, it is only fair to adopt the Company's characterization of Kiani—made under oath in its verified complaint—in analyzing the Company's efforts to resist enforcement of the Forum Selection Clause to which it agreed.

[123] *See* 2015 Agreement §§ 7.4 (allowing Kiani to terminate his employment for Good Reason if he is no longer "Chairman of the Board . . . or [in the case of] the designation of any director other than [Kiani] as the lead director of the Board[.]") 9(iii) (a director Change in Control provision, entitling Kiani to a Special Payment if "there shall occur a change in the Board in which the individuals who constituted the Board at the beginning of the twelve (12) month period immediately preceding such change cease for any reason to constitute two-thirds or more of the directors then in office."); First Amendment (extending the Change in Control lookback period to twenty-four months).

[124] FAC ¶ 23; *see id.* ¶¶ 30 ("The Board adopted the challenged provisions in Mr. Kiani's Employment Agreement for improper reasons, divesting itself of the power to oversee Mr. Kiani and erecting inequitable barriers to the free exercise of the stockholder franchise."), 85 (noting that in the Politan Action the Court "examined the DCCP and the other problematic provisions of the Employment Agreement and concluded that there was a lack of clarity of what the purpose of all this would be absent an intent to impact the stockholder franchise for the nomination of directors in connection with an election contest." (internal quotation marks omitted)); OA Tr. 73:19-22 ("the gravamen of [the Company]'s claims here are that this is an agreement between the company and the controlling stockholder basically in his capacity as such.").

25

Further, in executing the Employment Agreement, Kiani also contracted at least in part as a "prospective stockholder[.]"[125] Upon a triggering event, the Employment Agreement "[o]bligates [the Company] to make massive payments to [] Kiani, including restricted stock units ('RSUs') equal to *5% of the Company's outstanding shares*[.]"[126] This constitutes the bulk of the disputed Special Payment and is central to both the California Action and this action.[127] The Company alleges "the Special Payment w[as] the product of breaches of fiduciary duty" "designed to prevent the Board from exercising its non-delegable duty to manage the business and affairs of [the Company]."[128] And the Company asserts "the Special Payment . . . had as its primary purpose to [] interfere with the stockholders' ability to elect directors[.]"[129] Kiani's entitlement to this prospective issuance, "equivalent to a stunning 5% of the Company[,]"[130] flows from his entry into the Employment Agreement; as such, he made the agreement at least in part as a prospective

---

[125] 8 *Del. C.* § 122(18).

[126] FAC ¶ 7 (emphasis in original).

[127] *See id.* ¶¶ 116-21 (alleging the "Invalid Provisions," including the "Special Payment" were designed "to alter the intra-governance powers of the directors improperly and inequitably (in favor of Mr. Kiani)."), 122-26 (seeking a declaration that "[t]he Special Payment is invalid" and constitutes "a punitive tax against the franchise to dissuade [the Company's] stockholders from voting to remove Mr. Kiani from office."), 127-29 (seeking a declaration that "[t]he Special Payment [a]mounts to [w]aste[.]"), 130-35 (alleging the "invalid provisions" including the Special Payment "improperly and inequitably altered the intra-governance powers of the Board (in favor of Mr. Kiani) and erected inequitable barriers to the free exercise of the franchise rights of [the Company's] stockholders[.]").

[128] *Id.* ¶¶ 119, 133; *see id.* ¶¶ 117 ("The purpose of the Invalid Provisions contained within the Employment Agreement [including the Special Payment] was to alter the intra-governance powers of the directors improperly and inequitably (in favor of Mr. Kiani).").

[129] *Id.* ¶ 123.

[130] *Id.* ¶ 48; *see id.* ¶ 119 (alleging "the Special Payment is an unconscionably high amount that was designed prevent the Board from exercising its non-delegable duty to manage the business and affairs of [the Company]."); 2015 Agreement § 8.4(iii); First Amendment (eliminating the Burn-Off Provision).

26

stockholder. Accordingly, the Court next considers whether the Employment Agreement is the type of contract § 122(18) covers.

In *Moelis*, this Court discussed the difference between governance agreements "that allocate authority among internal corporate actors and seek to constrain the board" and general "commercial agreements."[131] To be sure, *Moelis* was concerned with "governance agreements" while § 122(18) applies to agreements between a corporation and a stockholder in his or her capacity as such, which is at least arguably broader. For purposes of this case, the Court need not define the full scope of agreements covered by § 122(18). Rather, it is sufficient to determine that a governance agreement between a corporation and its controller qualifies as a § 122(18) agreement. Indeed, that conclusion flows naturally from the circumstances surrounding the legislature's enactment of § 122(18).[132]

The *Moelis* decision identified a permissive, non-exclusive list of factors to help determine whether a contract is a governance agreement.[133] Under *Moelis*, governance agreements (1) "frequently have a statutory grounding in a section of the DGCL"; (2) have "intra-corporate actors" as counterparties; (3) contain "provisions

---

[131] *West Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 311 A.3d 809, 840-41 (Del. Ch. Feb. 23, 2024), *abrogated on other grounds by*, *Moelis*, 2026 WL 184868, at *1. Although the Delaware Supreme Court abrogated *Moelis* on laches grounds, the factors the decision identified can be repurposed here to aid in determining whether § 122(18) covers the Employment Agreement.

[132] The official synopsis shows the legislature enacted § 122(18) explicitly to authorize the "stockholder agreements" declared invalid in *Moelis*. Del. S.B. 313, syn., 152d Gen. Assem. (2024) ("New § 122(18) provides bright-line authorization for contractual provisions addressing the matters listed above, and therefore would provide for a different rule than the portion of the *Moelis* decision in which the Court held that contract provisions of this nature must be included in the certificate of incorporation to be valid." (citing *Moelis*, 2024 WL 747180, at n.272 (Del. Ch. Feb. 23, 2024))). It logically follows that the "governance agreements" discussed in *Moelis* fall within § 122(18).

[133] *Moelis*, 311 A.3d at 858-60.

27

[that] seek to specify the terms on which intra-corporate actors can authorize the corporation's exercise of its corporate power"; (4) do "not readily reveal an underlying commercial exchange"; (5) have "governance rights a[s] the[ir] point"; (6) "involve control rights, so the presumptive remedy will be equitable relief enforcing the right"; and (7) are "more likely to be enduring, even indefinite. Either the corporation will lack the ability to terminate, or the right will be heavily constrained."[134] These factors are "[a]ll [] matters of degree" and "[n]one are essential."[135]

Reviewing the Employment Agreement shows several of those factors are present here.[136] First, there is no doubt that Kiani is an intra-corporate actor as a large stockholder, the Company's controller, and former CEO and Chairman of the Board.[137] Second, the Employment Agreement has an indefinite term and the Company's ability to terminate is heavily constrained.[138] Third, the Employment Agreement's purpose was "to alter the intra-governance powers of directors improperly and inequitably (in favor of Mr. Kiani)."[139] Indeed, the Company alleges the Employment Agreement's "precise purpose . . . was to divest the Board of any control over [] Kiani."[140] To illustrate, Section 7.4 allowed Kiani to terminate his

---

[134] *Id.*

[135] *Id.* at 859.

[136] Indeed, the *Moelis* court observed that "[m]ost employment agreements are commercial contracts, but an agreement with a CEO [that] implicates the internal division of authority between the board and the corporation's senior officer" is a governance agreement. *Id.* at 840-41.

[137] *See* FAC ¶¶ 1, 13, 28-29.

[138] *Id.* ¶ 23; *see* 2015 Agreement § 3.

[139] FAC ¶ 117.

[140] *Id.* ¶ 4.

28

employment for "Good Reason" and receive a Special Payment if he was no longer Chairman or the Board appointed a lead independent director.[141] Fourth, and relatedly, the Employment Agreement specifies terms on which corporate actors can exercise the Company's power.[142] The agreement required "a vote of 75% of the entire membership of the Board to terminate [] Kiani for cause,"[143] and "[i]ncludes a dead hand provision . . . that irrevocably eliminates the Board's authority to disable certain change-in-control provisions[.]"[144] Finally, the Employment Agreement is not tied to a specific, one-off, commercial exchange; instead it is a lasting agreement whose "purpose is to allocate control rights" over the long term.[145] For example, Kiani had a right to a Special Payment in the event of a "change in control," defined as a change to more than one-third of the Board's membership over 24-months.[146] Further the Board's removal of the Burn Off Provision and the Employment Agreement's indefinite term were allegedly designed to make Kiani's control over the Company

---

[141] FAC ¶ 44 (citing 2015 Agreement § 7.4).

[142] *See, e.g.*, *id.* ¶ 23 ("the Employment Agreement [] ha[s] nothing to do with retaining CEO talent and everything to do with placing unreasonable restrictions on the stockholders' right to elect directors of their choosing."). Indeed, the Employment Agreement's restrictions on the Board's governance and control rights were allegedly so extensive that a former director testified "that the risk of triggering [a] Special Payment was a 'very scary prospect for [him].'" FAC ¶ 6.

[143] *Id.* ¶¶ 7, 91, 117; *see* 2015 Agreement § 7.3.

[144] FAC ¶¶ 7, 117; *see* 2015 Agreement § 9(iii).

[145] *Moelis*, 311 A.3d at 859 ("In a services agreement, supply agreement, or credit agreement, the contract reflects a clear exchange of consideration. With governance arrangements, the point is governance. That is not to say that the agreements are invalid because they lack a peppercorn of consideration. They plainly possess that. But the purpose of a governance arrangement is to allocate control rights."); *see* FAC ¶¶ 1-2, 6, 46-47, 53. *See also id.* ¶¶ 61-92 (detailing how Kiani allegedly used the control enhanced by the Employment Agreement for his personal benefit and to the Company's detriment).

[146] *Id.* ¶¶ 46-49, 55 (citing 2015 Agreement §§ 8.4, 9(iii); First Amendment).

permanent.[147] These factors indicate the Employment Agreement qualifies as a governance agreement covered by § 122(18).[148]

The Company's own portrayal of the Employment Agreement is most persuasive and dispels any doubt that § 122(18) applies. The operative complaint describes the Employment Agreement "as functioning as a poison pill" whose "precise purpose . . . was to divest the Board of any control over Mr. Kiani" and serve as a "defensive mechanism to protect Mr. Kiani's control[.]"[149] At oral argument, the Company repeatedly called the Employment Agreement "a poison pill . . . that disable[d] [the] [B]oard from supervising the CEO and undermine[d] the free exercise of [] stockholder franchise."[150] Indeed, this is the very foundation on which the Company's claims in this action rest.[151] The Company cannot walk away from these prior statements simply because it is now more advantageous to argue the Employment Agreement is an employment contract.[152]

---

[147] See id. ¶¶ 48-51, 54, 131-32 (citing 2015 Agreement §§ 3, 7.4, 8.4; First Amendment).

[148] This conclusion is consistent with the Court's prior suggestion in the Politan Action that the Employment Agreement went quite significantly beyond a standard CEO employment agreement. See *Politan Cap. Mgmt. LP v. Masimo Corp.*, C.A. No. 2022-0948-NAC, at 173-91 (Del. Ch. Feb. 3, 2023) (TRANSCRIPT).

[149] FAC ¶¶ 4-5, 131-32; see Masimo MTDQ ¶ 12 ("Masimo intends to prove that the Special Payment—along with the other Invalid Provisions—was designed with the purpose of entrenching Mr. Kiani in control of Masimo indefinitely").

[150] OA Tr. 22:7-13; see id. 23:7-10 ("[O]ne of the directors at the time at [the Company] said that [] Joe Kiani's employment agreement and special payment provision operated like a poison pill[.]"), 38:15-19 ("[T]he employment agreement here is effectively a poison pill[.]").

[151] See FAC ¶¶ 1-24, 116-35.

[152] See *Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008) ("Judicial estoppel acts to preclude a party from asserting a position inconsistent with a position previously taken in the same or earlier legal proceeding. The doctrine is meant to protect the integrity of the judicial proceedings."). Although the Court is not making an affirmative ruling that judicial estoppel applies, the fact that the Company's current position is contrary to its prior statements undermines the persuasiveness of that argument.

The Company argues that stockholder agreements and employment agreements are fundamentally different and mutually exclusive, relying on the distinction between § 122(5) and § 122(18).[153] Section 122(5) empowers a corporation to "[a]ppoint such officers and agents as the business of the corporation requires and to pay or otherwise provide for them suitable compensation[.]"[154] Unlike § 122(18), contracts covered by § 122(5) "shall be subject to § 141(a) of [the DGCL] to the extent it is applicable[.]"[155] Indeed, the legislature amended § 122(5) at the same time it enacted § 122(18) to "clarify that management contracts and other arrangements appointing or delegating authority to an officer or agent to act on behalf of the corporation continue to be subject to § 141(a) and the related common law[.]"[156] Thus, under the Company's view, because the Employment Agreement provides terms related to Kiani's employment as CEO, such as his compensation, it is exclusively a § 122(5) agreement subject to § 141(a) and § 115.

The separate source of authority under § 122(5) and § 122(18) does not mean that employment agreements and stockholder agreements are mutually exclusive, any more than governance agreements and contracts governed by § 218 are mutually

---

[153] *See* Pl. Supp. Br. ¶ 21; Pl. Supp. Opp'n ¶¶ 19-20 ("Clearly, the General Assembly knew how to describe compensation agreements with officers and stockholder agreements, but it chose to circumscribe Section 122(18) to stockholder agreements only. Had the General Assembly intended to include employment agreements in the scope of Section 122(18), it would have said so." (citing *Brown v. State*, 36 A.3d 321, 325 (Del. 2012))).

[154] 8 *Del. C.* § 122(5).

[155] 8 *Del. Ch.* § 122(5).

[156] Del. S.B. 313, syn., 152d Gen. Assem. (2024).

exclusive. A contract can implicate both § 122(5) and § 122(18).[157]  Indeed, § 122(18)'s legislative synopsis suggests corporate contracts need not fall into a single category, by stating that "[c]orporations may continue to rely upon § 122(13) to make contracts, *including contracts containing the types of provisions addressed by § 122(18)*[.]"[158] There is nothing inherently preventing a contract from specifying the terms of an officer's employment *and* imposing the obligations § 122(18) contemplates.  Indeed, that is exactly what the Employment Agreement does.[159]  Thus, the Court holds the Employment Agreement implicates both § 122(5) and § 122(18)[160] such that § 122(18) authorizes the Forum Selection Clause.[161]

---

[157] *See Godden v. Franco*, 2018 WL 3998431, at * (Del. Ch. Aug. 21, 2018) (holding in the LLC context that a "contact [can be] both [] [a] governing document . . . and [] an investor-level agreement comparable to a stockholder agreement.")

[158] Del. S.B. 313, syn., 152d Gen. Assem. (2024) (emphasis added).

[159] *See* 2015 Agreement § 5 (detailing Kiani's CEO compensation), § 7 (restricting the Company's ability to terminate Kiani), § 9 (entitling Kiani to a "Special Payment" in the event of a "Change in Control").  Consistent with the idea that the Employment Agreement implicates both § 122(5) and § 122(18), it is fair to say Kiani entered into the contract in his capacity as a stockholder and in his capacity as CEO.

[160] To be clear, the Court is only ruling that Employment Agreement is a stockholder agreement for purposes of determining the validity of the Forum Selection Clause under § 122(18).  This decision does not address whether or how § 122(5), which the Delaware legislature amended at the same time it adopted §122(18), impacts the substantive interpretation of the amended Employment Agreement's terms.  Instead, the Court leaves for another day questions regarding how § 122(5) and § 122(18) interact for purposes of interpreting the parties' substantive claims.

[161] Other considerations buttress the conclusion that a forum selection provision in a contract touching both § 122(5) and § 122(18) can route related internal affairs claims outside of Delaware.  Only § 122(18) cites § 115 or discusses forum selection provisions. *See* 8 *Del. Ch.* § 122(18).  Section 122(5) does not discuss forum-selection provisions and "[t]he legislative synopsis's discussion of the 2024 amendment to Section 122(5) also says nothing about forum-selection clauses." Defendant Joe E. Kiani's Opening Supplemental Submission in Further Support of Motion to Dismiss Plaintiff's First Amended Verified Complaint ¶¶ 24-29 (Dkt. 92); *see* 8 *Del. Ch.* § 122(5). Also, employment agreements under § 122(5) are "subject to § 141(a) . . . *to the extent it is applicable.*" 8 *Del. Ch.* § 122(5) (emphasis added).

**D. The Clear Expression Rule Does Not Survive § 122(18)**

Finally, the Company asserts that notwithstanding the Forum Selection Clause's admittedly broad language,[162] it does not apply here because it lacks a "clear expression" of intent to cover fiduciary duty claims.[163] Citing *Parfi* and its progeny, the Company argues that although a party always could agree to route internal affairs claims to another forum, it must do so via a clear expression of intent.[164]

As a threshold matter, the Company's clear expression rule argument, which it made almost exclusively at oral argument and in its supplemental filings,[165] contradicts arguments in its original brief opposing Kiani's motion to dismiss. The Company now contends that it "always has been true" that "[a] corporation can route internal affairs claims outside of Delaware in a stockholder contract if it evinces a

---

[162] OA Tr. 41:8-42:6 (the Company agreeing drafters use the phrase "relating to" in a contract "when they want to capture the broadest possible universe."); *see Flotek*, 262 A.3d at 1083 (holding "[t]he phrase 'relating to' is . . . 'paradigmatically broad.'"); *City of Newark v. Donald M. Durkin Contracting, Inc.*, 305 A.3d 674, 680 (Del. 2023).

[163] *See Parfi*, 817 A.2d at 160 & n.44 (emphasis added) (citing *DMS Properties–First, Inc. v. P.W. Scott Associates, Inc.*, 748 A.2d 389, 391 (Del. 2000) ("A party cannot be forced to arbitrate the merits of a dispute . . . in the absence of a clear expression of such intent in a valid agreement.")). It is not clear that *Parfi*'s use of the phrase "clear expression" necessarily imposed a substantive requirement beyond the Independent-Source Principle that § 122(18) abrogated as discussed above. Rather, *Parfi* seemingly only used the phrase "clear expression" in passing to refer to "a clear expression of *an intent to arbitrate*." *Id.* (emphasis added). Indeed, scads of Delaware case law show the phrase "clear expression" is so ubiquitous in the arbitration context as to be almost a term of art. *See, e.g., Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 n.9 (Del. 2010) (citation modified); *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78-79 (Del. 2006); *SBC Interactive, Inc. v. Corp. Media P'rs*, 714 A.2d 758, 761 (Del. 1998). Within the arbitration context, a "clear expression" refers to whether the agreement "contains clear and unmistakable evidence of the parties' intent to arbitrate," as opposed to whether the provision simply covers a particular class of claims. *Fairstead Capital Management LLC v. Blodgett*, 288 A.3d 729, 736 (Del. Ch. 2023).

[164] *See* Pl. Supp. Br. ¶¶ 1, 6-8, 13-18; Pl. Supp. Opp'n ¶¶ 1-4; OA Tr. 30:1-33:1, 40:12-18. *See also Parfi*, 817 A.2d at 159-60 ("[S]ome agreements, by their nature, extend so far as to mandate arbitration for breach of fiduciary duty claims[.]").

[165] *Compare* MTD Opp'n (never using the phrase "clear expression" and citing *Parfi* only in passing), *with* Pl. Supp. Br. ¶¶ 1, 6-8, 13-18 (advancing the "clear expression" argument heavily based on *Parfi*), *and* Pl. Supp. Opp'n ¶¶ 1-4 (same), *and* Tr. 30:1-33:1, 40:12-18 (same).

clear intention to do so."[166] That directly contradicts the *Harris*-based argument that "forum selection provisions in commercial agreements . . . do not include within their terms breaches of fiduciary duties and other matters that implicate the internal affairs of Delaware corporations."[167] In making its clear expression argument, the Company did not address that contradiction.[168]

Parties can always agree–for their own purposes–on where to litigate claims.[169] Thus, the Company's clear expression argument is concerned with the extent to which parties can contract *in advance* to route breach of fiduciary duty claims away from Delaware courts. Under that argument, even if the Independent-Source Principle does not prohibit such contracts, *Parfi* suggests a forum selection clause would have to call out fiduciary duty claims specifically to bring them within the provision's scope.[170] Section 115 of the DGCL and Section 18-109(d) of the LLC Act, post-*Elf Atochem*, similarly limit the extent to which the constitutive documents can effectuate that type of advance agreement.[171] Yet, as discussed, for stockholders

---

[166] Pl. Supp. Br. ¶ 13; *see* Pl. Supp. Opp'n ¶ 1.

[167] MTD Opp'n at 21-26 (citing Harris, 2023 WL 193078, at *24).

[168] *See* Pl. Supp. Opp'n ¶ 1 ("*Section 122(18) merely codifies what always has been true*: Forum selection clauses can route fiduciary duty claims outside of Delaware only if there is a clear expression in explicit language evincing an intent to do so." (emphasis added)); *State v. Connors*, 505 A.2d 1301, 1302 (Del. Super. 1986) ("It is a principle of statutory construction that the General Assembly cannot be presumed to have performed a meaningless act."); *Henriksen v. Meyer*, 1986 WL 8004, at *1 (Del. Super. May 13, 1986) (rejecting a proposed statutory construction that would render the provision "redundant and meaningless" because "the General Assembly cannot be presumed to have enacted language that has no effect or meaning.").

[169] For example, once a claim for breach of fiduciary duties arises, those affected by the claim could agree to resolve the dispute via arbitration.

[170] *See Parfi*, 817 A.2d at 160.

[171] *See* 8 *Del. C.* § 115; 6 *Del. C.* § 18-110.

34

agreements under § 122(18) those limitations no longer apply. Therefore, to the extent *Parfi* and its progeny articulated a clear expression rule as the Company suggests, § 122(18)'s abrogation of the Independent-Source Principle also removed that requirement.

Accordingly, the Company's arguments that the Forum Selection Clause (1) is displaced by the Bylaws Provision; (2) cannot capture fiduciary duty claims; (3) does not implicate § 122(18); and (4) fails the clear expression rule test, all fall flat. Therefore, all that remains for the Court to address is whether the Forum Selection Clause's plain text covers the Company's claims asserted here.[172]

## E. The Forum Selection Clause's Plain Text Captures the Company's Claims

The Forum Selection Clause covers the Company's breach of fiduciary duty and waste claims under both California and Delaware law. Delaware courts interpret "forum selection clause[s] in accordance with the law chosen to govern the contract."[173] Here, the Employment Agreement selects California law.[174] California law recognizes the general proposition that a "forum-selection clause [should] be

---

[172] *See WWEC Holdings III Corp. v. Hackman*, 2026 WL 819022, at *5 (Del. Ch. Mar. 25, 2025) ("As with any contractual provision, when interpreting a forum selection clause, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." (internal quotation marks omitted)); *Ingram v. Thorpe*, 2014 WL 4805829 at *3 (Del. Sept. 26, 2014) (Table) ("In the absence of any ambiguity, the parties are bound by the plain meaning of their contract.").

[173] *Ashall Homes Ltd. v. ROK Ent. Gp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010).

[174] 2015 Agreement § 20. To the extent there is any debate concerning whether Delaware or California law apply, the Count need not resolve that dispute because, as discussed herein, the result is the same under both California and Delaware Law. *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010) (concluding that where "the results would be the same under both" states' law, "[c]ourt[s] should avoid [a] choice-of-law analysis.").

35

given controlling weight in all but the most exceptional cases."[175] Faced with clear contractual language, "the burden of proof is on the party resisting the forum [selection clause] to demonstrate the selected forum would be unavailable or unable to accomplish substantial justice or that no rational basis exists for the choice of forum."[176] Under California contract law, "the phrase 'arising under or related to' is very broad" and covers any claims that "'touch matters' covered by the contract containing the [forum selection] clause."[177] That is true "regardless of how the[] [claims] are characterized."[178]

Delaware law largely agrees. Forum selection clauses under Delaware law "are presumptively valid and should be specifically enforced unless the resisting party clearly shows that enforcement would be unreasonable and unjust, or that the clause is invalid for such reasons as fraud and overreaching."[179] Notably, "a party cannot make an end-run around an otherwise enforceable forum selection provision through an argument about the enforceability of other terms in the contract[.]"[180] As

---

[175] *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the We. Dist. of Tex.*, 571 U.S. 49, 59-60 (2013) (citation modified); *see Olinick v. BMG Ent.*, 2 Cal. Rptr. 3d 268, 274 (Ct. App. 2006).

[176] *Ramos v. Superior Ct. of S.F. Cty.*, 239 Cal. Rptr. 3d 679, 702 (Ct. App, 2018) (citation modified). In conducting that analysis, "[n]either inconvenience nor the additional expense of litigating in the selected forum is a factor to be considered." *Id.* (citation modified).

[177] *Id.* at 689; *see Nedlloyd Lines B.V. v. Superior Ct. of San Mateo Cty.*, 3 Cal. 4th 459, 468-69 (1992) (en banc). Conversely, the phrases "'arising from' or 'arising out of'" alone "have generally been interpreted to apply only to disputes regarding the interpretation and performance of the agreement." *Ramos*, 239 Cal. Rptr. 3d at 689.

[178] *Olinick*, 42 Cal. Rptr. 3d at 279 (citation modified).

[179] *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del. 2010) (citation modified).

[180] *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 380 (Del. 2013) (citation modified). Therefore, the Company's allegations that certain provisions of the Employment Agreement are invalid and the product of Kiani's improper control or the Board's breaches of fiduciary duties do not prevent enforcing the Forum Selection Clause because the Company does not claim "the forum selection clause itself is invalid." *Id.*

in California, the phrases "'arise out of' or 'related to'" connote a "[b]road forum selection clause[.]"[181]  Indeed, the parties agreed at oral argument that drafters use the phrase "relating to . . . when they want to capture the broadest possible universe."[182]  "[A]rising out of" covers claims "'based on the rights and obligations created by the underlying agreement'" and those that "'would [not] be assertable' in the absence of the agreement."[183]  "Relating to" is broader and "encompasses 'any issues that touch on contract rights or contract performance."[184]

Under those standards, the Forum Selection Clause covers the Company's claims under both California and Delaware law.  The FAC contains numerous allegations concerning the Employment Agreement[185] and all four causes of action reference the contract or its enactment.[186]  The Company agreed at oral argument

---

[181] *ASDC Hldgs., LLC v. Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Tr.*, 2011 WL 4552508, at *5 (Del. Ch. Sept. 14, 2011) (internal quotation marks omitted).

[182] OA Tr.41:8-42:6; *see City of Newark*, 305 A.3d at 680 (holding the phrase "related to" "sweeps broadly and . . . [i]s paradigmatically broad[.]" (internal quotation marks omitted)); *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *10 (Del. Ch. Jan. 23, 2006) (holding "relating to" is a "far-reaching term[] often used by lawyers when they wish to capture the broadest possible universe.").

[183] *Flotek*, 262 A.3d at 1082-83 (quoting *Parfi*, 817 A.2d at 151, 157).

[184] *Id.* at 1083 (quoting *ASDC*, 2011 WL 4552508, at *5) (citation modified); *see Abry P'rs*, 891 A.2d at 1047 (holding that the phrase "relating to" caused a contract provision to govern both "contract claims that might arise among the parties" and "claims in tort seeking rescission" of the agreement). *See also Harrison v. Dixon*, 2015 WL 757819, at *4 (Del. Ch. Feb. 20, 2015) ("An action for a breach of fiduciary duty is characterized as a tort.").

[185] *See* FAC ¶¶ 1-4, 6-11, 30-60, 83-92, 95-96, 107-110, 113-14.  Further indicating the Employment Agreement's importance to the Company's claims, Exhibits A-C to the FAC are the 2015 Agreement, the First Amendment, and the Second Amendment. *See* FAC, Exs. A-C.

[186] *See* FAC ¶¶ 117-19 (seeking a declaration that certain "[p]rovisions of the Employment Agreement [a]re [u]nenforceable" and requesting they "be severed from the Employment Agreement and declared of no force and effect."), 123-26 (alleging "the Special Payment" provision of the Employment Agreement "was designed and had as its primary purpose to (i) interfere with the stockholders' ability to elect directors and (ii) secure Mr. Kiani's incumbency."), 128-29 (claiming the "Special Payment [a]mounts to [w]aste."), 131-33 (seeking a declaration that certain provisions of the Employment Agreement "including the Special Payment, were the product of breaches of fiduciary duty[.]").

that "absent the [E]mployment [A]greement, there would be no claims . . . in this action[.]"[187]  The Company also admitted its claims "touch on," "relate to," and are "broadly in connection with" the Employment Agreement.[188]  Given those allegations and concessions, the Company's claims "arise out of or relate to" the Employment Agreement under either California or Delaware law.  Thus, the Forum Selection Clause's text indicates the Company's claims belong in California.

Taken together, the above analysis leads to only one conclusion – this case does not belong in Delaware.  The plain text of the Forum Selection Clause to which the Company contractually agreed covers its claims here under both California and Delaware law.  The Company's somewhat conflicting attempts to avoid the Forum Selection Clause's application (1) ignore the Bylaws Provision's carve-out; (2) disregard § 122(18)'s impact on the Independent-Source Principle; and (3) do not support the idea that § 122(5) and § 122(18) agreements are mutually exclusive.  This Court refuses to endorse those efforts.  Instead, the Court applies standard principles of contract interpretation, recognizing the legislature's enactment of § 122(18), and the well-settled principle that forum selection clauses should be enforced in most circumstances.[189]  Accordingly, the Court concludes that the Forum Selection Clause

---

[187] OA Tr. 35:20-36:11, 59:21-60:8 (the Company agreeing that "[i]f there was no [E]mployment [A]greement . . . we would [not] be here.").

[188] *Id.* 38:5-40:6, 42:18-20, 59:14-16.

[189] *See Salzberg*, 227 A.3d at 132 ("[F]orum-selection clauses are presumptively valid and enforceable under Delaware law. . . . United States Supreme Court precedent . . . requires courts to give as much effect as possible to forum-selection clauses[.]" (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972))).

is valid and compels litigating the Company's claims in California. Kiani's Motion to Dismiss based on the Forum Selection Clause is granted.

## IV. CONCLUSION

For the reasons discussed above, Kiani's Motion to Dismiss is granted. As discussed at oral argument, that result moots Kiani's Motion to Disqualify. The parties are instructed to submit an implementing order consistent with this opinion within ten days.